## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON BALTIMORE,**<br>**19620 Tenaja RD**<br>**Murrieta CA 92562**<br><br>   *Plaintiff,*<br><br>**v.**<br><br><br>**CHERE REXROAT, ACTING ARCHITECT**<br>**OF THE CAPITOL**<br>**SB- 15 U.S. Capitol Building**<br>**Washington, DC 20515,**<br><br>     **Serve:**<br><br>     **Chere, Rexroat, Acting Architect**<br>     **of the Capitol**<br>     **SB-15 US Capitol Building**<br>     **Washington, DC 20515,**<br><br>     **United States Attorney's Office**<br>     **for the District of Columbia,**<br>     **Attn: Civil Process Clerk**<br>     **555 4th St., NW**<br>     **Washington, DC 20530,**<br><br>     **Merrick B. Garland, Attorney General,**<br>     **950 Pennsylvania Avenue, NW**<br>     **Washington, DC 20530-0001,**<br><br>                   *Defendants.* | **Case No. _** |

## COMPLAINT FOR EQUITABLE AND MONETARY RELIEF

Claimant Jason Baltimore brings this complaint against Defendant the Architect of the Capitol ("AOC") for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), the Uniform Services Employment and Reemployment Rights Act,  38 U.S.C.A. § 4311 *et seq.*, ("USERRA") as applied to the agency by the Congressional Accountability Act of 1995 ("CAA"), as amended by the CAA 1995 Reform Act of 2018. 2 U.S.C. § 1311, *et seq.*, when it ended Baltimore's employment with the AOC.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Title VII, USERRA, and ADEA.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the Defendants' headquarters are in this judicial district and the alleged violations took place in this judicial district.

## PARTIES

3.      Claimant Jason Baltimore is domiciled in Murrieta, CA and was employed by the AOC as its general counsel.

4.      Baltimore is an "employee" as defined by 42 U.S.C. § 2000e and a "covered employee" pursuant to the CAA at 2 U.S.C. § 1301(3)(F).

5.      Defendant AOC is the federal agency responsible for the maintenance, operation, development, and preservation of the United States Capitol Complex, with its headquarters located at SB-15 U.S. Capitol, U.S. Capitol Building, Washington, DC 20515.

6.      The AOC is an "employer" as defined by 42 U.S.C. § 2000e and an "employing office" pursuant to the CAA at 2 U.S.C. § 1301(9)(D).

2

**FACTUAL ALLEGATIONS**

7.       Baltimore is a 55-year-old black male residing in Murrieta, CA.

8.       Baltimore served in the Navy for 22 years, working mainly as an attorney, before retiring as a supervising attorney for the US Navy Judge Advocate General Corps.

9.       The AOC appointed Baltimore to the position of General Counsel on September 24, 2012, and the AOC was Baltimore's direct supervisor.

10.       In his role Baltimore helped resolve legal matters, answered legal questions, and reviewed the legality of proposed AOC actions. Baltimore performed well at AOC and had no disciplinary record.

11.       Baltimore met on a regular basis with Brett Blanton when he was the Architect, and he also met with Erin Courtney, the acting director of legislative affairs, in his capacity as general counsel.

12.       As part of his general counsel duties and responsibilities Baltimore served as the Architect's principal spokesperson on legal matters before Congress, other agencies and the public and was in frequent communication with congressional staffers whose roles included providing funding appropriations for the AOC budget.

13.       In or about November 2020, the AOC hired Christine Leonard as its director of legislative and public affairs ("LPA").

14.       The LPA director position is influential as it allows for one person to manage both public communications as well as communications with staffers for the Senate Committee on Rules & Administration and the House Committee on House Administration, which typically make decisions for the AOC that the Architect usually must follow. The director of legislative and public affairs meets daily with the Architect.

15.     Courtney onboarded Leonard as the outgoing acting director and then became her direct report, resuming her permanent position as public affairs officer until she resigned in February 2021.

16.     Leonard asked Courtney during the onboarding process why the AOC employed so many military veterans, and Courtney replied that the Office of Personnel Management favors veterans in the hiring process and that many military veterans possess the prerequisite skills for many AOC positions.

17.     Leonard regularly and critically declared to Courtney that she believed there were too many male veterans in executive positions at the AOC after Courtney began reporting to Leonard.

18.     Leonard also regularly complained to Mary Jean Pajak, the AOC's deputy chief of staff, about Baltimore, AOC chief financial officer Jonathan Kraft, and AOC chief administrative officer Bill O'Donnell, criticizing their use of military language and opining that they engaged in "mansplaining" during work meetings.

19.     Leonard also alleged that Baltimore was acting in an obstructionist manner and was operating without accountability. She alleged that Baltimore refused to advise AOC personnel on matters, did not provide support to her, and did not provide a legal opinion that supported the position of the House or Senate.

20.     Complaints against Leonard by her reports began as soon as she began as LPA. Deputy general counsel Angela Freeman and Courtney both noted to Baltimore that the LPA office experienced higher turnover under Leonard.

21.     In addition, multiple employees alleged that Leonard had discriminated against them on multiple bases, particularly on the basis of sex. Leonard resented men in positions of authority above her in rank and routinely demeaned women who served under her.

22.     Courtney complained to Baltimore that Leonard prevented Courtney from performing any work under her and suggested that it was discrimination on the basis of sex. In response, Baltimore spoke to Leonard and asked Leonard to treat Courtney with respect and include her in more projects.

23.     In or about January of 2022, an AOC employee filed an OCWR complaint against AOC, alleging that Leonard discriminated against her on multiple bases, including gender.

24.     In or about May of 2022, an anonymous review of AOC as an employer on the website Glassdoor accused Leonard of, among other complaints, discriminating against her female reports.

25.     This review prompted an external counsel hired by AOC named Christine Cooper to conduct an investigation into Leonard based on the allegations in the Glassdoor review. The investigation was closed with inconclusive results in or about September of 2022.

26.     In or about December of 2022, Leonard requested to Blanton that AOC respond to the Glassdoor review noting that the allegations in the review were not substantiated. Blanton initially agreed but then advised Leonard that he would need to ensure that the decision was compliant with AOC laws and regulations.

27.     Because other investigations and processes, such as the AOC employee complaint, had not been resolved, Baltimore's legal review of the action concluded that the AOC could not respond to the Glassdoor review. O'Donnell agreed with the decision, and so Blanton

told Leonard that the AOC could not respond to the Glassdoor review because of Baltimore's legal advice and O'Donnell's opposition to the idea on a similar basis.

28.     The AOC general counsel typically represents the AOC in meetings with Senate Rules Committee staffers. Throughout Baltimore's time as general counsel, he was subject to hostile interactions with the Senate Rules Committee staffers, interactions that were never reported by white AOC executives. During these meetings, Baltimore was typically the only non-white person in the room. One staffer referred to Baltimore as "you people."

29.     Multiple other AOC or AOC-affiliated staff recognized the staffers' specific distaste for Baltimore. Courtney opted to replace Baltimore in meetings with staffers to spare him the hostile interactions. An external counsel who frequently worked with AOC, named John Clifford, told Baltimore that he was concerned that Baltimore had been treated differently based on race, specifically by Senate Rules Counsel Wendy Smith.

30.     In addition to direct hostile interactions with Baltimore, the Senate Rules staffers, as well as the head of the Office of Inspector General, Chris Failla, frequently asked the AOC for information regarding OCWR complaints and sexual harassment complaints, including personally identifiable information ("PII").

31.     In order to comply with AOC rules, human resources regulations, and the law, both Baltimore and O'Donnell, in conjunction with head of human resources Theresa Bailey, refused to compromise the integrity of the complaint process by turning over the information.

32.     Failla responded to such refusals with increasing hostility over the course of Baltimore's time as general counsel.

33.     Failla and Senate Rules were displeased with Baltimore for his legal opinions that prevented them from accessing the information they requested regarding the personal information from the OCWR complaints and sexual harassment.

34.     In or about June 2022, the AOC allowed Baltimore to work remotely from his new home in Murrieta, CA so that he could care for his elderly in-laws.

35.     On or about February 13, 2023, Leonard asked chief of staff Peter Bahm to advise her as to which AOC employment positions served "at will" as opposed to being civil service. Bahm responded that all AOC executives served at the pleasure of the Architect. This conversation occurred while Leonard was answering questions from Senate Rules staff member Nichole Kotchwar.

36.     On or about February 13, 2023, President Joe Biden fired Blanton over a series of ethical violations involving impersonating a police officer, appropriating a public vehicle for private purposes, giving private tours of the Capitol, among other violations.

37.     Baltimore had no advance knowledge of most of these allegations and learned about them at the same time as the public.

38.     Baltimore, as general counsel, had no responsibility over Blanton's use of his official vehicle and did not brief him on its use. Baltimore did not advise Blanton concerning his legal issues regarding the allegations laid out against him.

39.     Chere Rexroat, the chief engineer, was named acting architect in or about March 2023. She cut off contact with Baltimore, O'Donnell, Bahm, and Kraft and worked solely with Leonard, Failla, and the Senate staffers.

40.     On or about March 3, 2023, the Office of Inspector General published a memo stating that 17 AOC employees had knowledge of Blanton's violations from the General Services

Administration but failed to notify the Office of the Inspector General. Baltimore and O'Donnell were falsely implicated in this report.

41.     In or about April of 2023 Leonard informed Susan Pell, executive director of the United States Botanic Gardens, that Baltimore had been giving Blanton legal advice in a personal capacity regarding his misuse of his government vehicle. In response, Pell corrected Leonard, explaining that Baltimore had not done so.

42.     Upon information and belief, Leonard told Rexroat and the Senate staffers that Baltimore had improperly given Blanton legal advice related to his misuse of a government vehicle.

43.     On or about April 6, 2023, Rexroat advised Baltimore that she was terminating his employment, effective immediately. Rexroat told Baltimore that she could not tell him why she was doing so. Rexroat had also fired Kraft, Bahm, O'Donnell, and Baltimore that same day.

44.     Baltimore opted to resign in lieu of termination, and O'Donnell opted to retire in lieu of termination.

45.     Bailey, despite normally being a part of the termination process, was not aware of Baltimore, O'Donnell, Kraft, and Bahm's terminations until after they had occurred.

46.     Rexroat terminated four out of five of the executive-level, older veteran men members of the AOC C-Suite. All four are veterans, and all are over 40 years old. The fifth male executive who had not been fired had only been hired a month prior. The remaining four female executives were not terminated, including chief security officer Val Hasberry, who had been implicated in the March 2023 OIG report and had direct responsibility over Blanton's use of his government vehicle.

47.     Upon information and belief, the Senate staffers argued in favor of Baltimore's removal due to his working remotely. However, two white AOC employees, Erin Doherty as well as Chris Failla, were allowed to work remotely. Failla specifically worked remotely without authorization from the AOC, meaning any funds he charged to AOC traveling were Anti-Deficiency Act violations. Failla and Doherty continue to work remotely.

48.     In addition, despite the Senate Rules Committee having previously barred acting AOC's from making staffing changes, acting AOC Rexroat was allowed to make significant changes to the very top of AOC, specifically to remove all of the male veterans from the executive staff.

49.     On or about April 6, 2023, a reporter for The Hill contacted Kraft for a comment on the articles they were about to publish about Baltimore's and the others' termination. The reporter advised that they were supplied a draft email that Rexroat would send to all AOC staff following the terminations. The email implied that Baltimore, Bahm, O'Donnell, and Kraft were implicated in Blanton's wrongdoing and jeopardized the AOC's accountability in partnership with Congress.

50.     The AOC's public affairs office, headed by Leonard, leaked the email to the press before it was even sent out to its intended recipients. Leaked communications and information are also a common tactic the Senate staffers employed throughout Baltimore's tenure at AOC.

51.     Because of the leaked internal email falsely implicating Baltimore in Blanton's wrongdoing, The Hill and Roll Call published articles on April 7, 2023, implying the same, unwittingly publishing false information and gravely damaging Baltimore's career and reputation. The article falsely claimed that Baltimore was terminated rather than resigning.

52.     Baltimore asked the AOC for severance pursuant to 5 U.S.C. § 5595 but was told he would not receive severance.

53.     As the result of AOC's illegal actions, Baltimore sustained mental anguish and economic damages, and he will continue to sustain damages into the future.

**COUNT I**
**Discrimination Based on Race**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 1311**

54.     Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

55.     Baltimore is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

56.     Baltimore is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

57.     The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

58.     The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

59.     The AOC illegally discriminated against Baltimore, based on his race, when it, through the Senate staffers, subjected Baltimore to a hostile work environment, and when the AOC terminated his employment on April 6, 2023.

60.     The AOC's stated reasons for terminating Baltimore are pretext for its unlawful race discrimination.

61.     Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT II**
**Discrimination Based on Sex**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 1311**

62.     Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

63.     Baltimore is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

64.     Baltimore is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

65.     The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

66.     The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

67.     The AOC illegally discriminated against Baltimore, based on his sex, when it terminated his employment on April 6, 2023.

68.     The AOC's stated reasons for terminating Baltimore are pretext for its unlawful sex discrimination.

69.     Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

**COUNT III**
**USERRA**
**38 U.S.C. § 4311(a)**
**Discrimination**

70.     Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

71.     Baltimore performed service in the United States Navy.

72.     AOC was motivated by the fact that he had served in the United States Navy when it terminated his employment.

11

73.     Baltimore lost a benefit of employment when AOC removed him from federal service.

74.     Baltimore's former membership in a uniformed service of the United States was a substantial or motivating factor in AOC's decision to remove Baltimore.

75.     Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

<u>**COUNT IV**</u>
**The Age Discrimination in Employment Act**
**29 U.S.C. §§ 621 et seq.**
**Discrimination**

76.     Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

77.     Baltimore is over 40 years old.

78.     The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

79.     AOC's decision to remove Baltimore was based on his age.

80.     AOC's stated reasons for its action are pretextual.

81.     Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

## COUNT V
**Retaliation**
**Title VII of the Civil Rights Act of 1964**
**2 U.S.C. § 2000e-3**

82.     Baltimore hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

83.     Baltimore is an "employee" as defined in 42 U.S.C. § 2000e(f) (Title VII).

84.     Baltimore is a "covered employee" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(3)(F) and 2 U.S.C. § 1301(4).

85.     The AOC is an "employer" as defined by 42 U.S.C. § 2000e (Title VII).

86.     The AOC is an "employing office" pursuant to the Congressional Accountability Act of 1995, 2 U.S.C. § 1301(9)(D).

87.     Baltimore conducted protected activity under Title VII when he protected the integrity of the AOC complaints process by refusing to provide PII of involved parties to the Senate staffers and the OIG.

88.     Baltimore conducted protected activity when he attempted to redress Leonard's hostile behavior towards Courtney.

89.     Baltimore also conducted protected activity when he provided legal advice to AOC denying Leonard's request to respond to the Glassdoor review accusing her of discrimination.

90.     The AOC illegally retaliated against Baltimore, based on his protected activity, when it terminated his employment on April 6, 2023.

91.     The AOC's stated reasons for terminating Baltimore are pretext for its unlawful retaliation.

92.     Baltimore sustained substantial monetary and non-monetary damages as the result of the AOC's conduct.

## PRAYER FOR RELIEF

Based on the foregoing, Baltimore respectfully requests that he be awarded the following relief against the AOC:

a.      Reinstatement or, in lieu thereof, full front pay and benefits;

b.      Economic damages for lost compensation and benefits and damages to Baltimore's career, reputation, and earning capacity in an amount to be determined;

c.      Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

d.      Injunctive and declaratory relief;

e.      Reasonable costs and experts' and attorneys' fees; and

f.      Any other such relief that a court may deem just and equitable.

Respectfully submitted,

*/s/ Anita M. Chambers*
Anita M. Chambers
R. Scott Oswald, DC 458859
Anita Mazumdar Chambers, DC 1046845
The Employment Law Group, P.C.
1717 K St NW, NW, STE 1110
Washington, DC  20006
(202) 261-2830
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
*Counsel for Jason Baltimore*